

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
RICHARD SCHONINGER, JACQUELINE
SCHONINGER, SCOTT SCHONINGER,
GERALD ALLEN, and COVA CAPITAL        :   Civil Action No.
PARTNERS, LLC
                                       :   **COMPLAINT**
        Plaintiffs,
                                       :   **JURY TRIAL DEMANDED**
-v-

JAMES GREEN and WILLIAM
WILKISON,

        Defendants.

------------------------------------------------------------ X

    Plaintiffs Richard Schoninger, Jacqueline Schoninger, Scott Schoninger, Gerald Allen and Cova Capital Partners, LLV, by their undersigned attorneys, for their Complaint against defendants James Green and William Wilkison, allege:

## SUMMARY

1.     This action arises out of the defendants' agreement to merge their company, Brighthaven Ventures, L.L.C. ("BHV"), with Islet Sciences, Inc. ("Islet") in exchange for plaintiffs' investment of over $1 million in Islet common stock and warrants. After plaintiffs invested $1 million in Islet in March 2014, defendants reneged on their agreement to convey their ownership interests in BHV to Islet on the agreed terms. As a result of defendants' breach of their agreement with plaintiffs, plaintiffs are entitled to compensatory damages equal to approximately 10% of the value of the combined assets of Islet and BHV. Defendants' actions also constituted common law fraud by making material misrepresentations in connection with

plaintiffs' purchase of Islet shares in March 2014. Defendants have also been unjustly enriched at plaintiffs' expense by using plaintiffs' funds for the exclusive benefit of BHV.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to common law.

3. This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims asserted, including the agreement to merge and the material misrepresentations made by the defendants to the plaintiffs, occurred in this judicial district.

## PARTIES

5. Plaintiff Richard Schoninger (hereafter "Schoninger") resides in New York, New York and is an accredited investor. Schoninger owns 4,000,000 shares of Islet common stock and warrants to purchase an additional 1,200,000 shares of Islet common stock.

6. Jacqueline Schoninger is the daughter of Richard Schoninger, resides in New York, New York and an accredited investor. She owns 800,000 shares of Islet common stock and warrants to purchase an additional 200,000 shares of Islet common stock.

7. Scott Schoninger is the son of Richard Schoninger, resides in New York, New York and an accredited investor. He owns 800,000 shares of Islet common stock and warrants to purchase an additional 200,000 shares of Islet common stock.

8. Plaintiff Gerald Allen resides Richmond County, New York and is a practicing attorney and an accredited investor. Allen owns 70,000 shares of Islet common stock and warrants to purchase an additional 35,000 shares of Islet common stock.

2

9. Plaintiff Cova Capital Partners, LLC ("Cova Capital") is a limited liability company organized under the laws of New York, with its principal place of business in Glen Head, New York, and acted as an investment banker for Islet during the relevant time period. Cova Capital received warrants to purchase 889,000 shares of Islet as compensation for soliciting investors, including the individual plaintiffs in this action. Cova Capital provided its investment banking services in reliance on defendants agreement to merge Islet and BHV. Cova Capital, its principal and CEO, Edward Gibstein, and his family own at total of 1,820,000 shares of Islet common stock and warrants to purchase an additional 1,489,000 shares of Islet common stock.

10. Defendant James Green is, upon information and belief, a resident of North Carolina, the Chief Executive Officer and Director of Islet, and owns 50% of the membership interests in BHV.

11. Defendant William Wilkison is, upon information and belief, a resident of North Carolina, the Chief Operating Officer and Director of Islet, and owns 50% of the membership interests in BHV.

## ALLEGATIONS

12. Islet is a public biotechnology company whose shares are trading on the Over-The-Counter Bulletin Board ("OTCBB"). Islet's public disclosure states that it is engaged in research, development, and commercialization of new medicines and technologies for the treatment of metabolic diseases and related indications where there is significant medical need. Islet reports that it is developing therapeutic candidates to address the needs of patients suffering from metabolic disease. Islet is also developing a diagnostic product candidate to better enable patients and their physicians to understand disease diagnoses and progression.

13. BHV is a private company owned by defendants Green and Wilkison pursuing the development of pharmaceutical products related to the rising incidence of obesity and the many

3

obesity-related health complications, including cardiovascular disease, diabetes, hyperlipidemia, hypertension, and nonalcoholic faulty liver disease/steatohepetitis (NAFLD/NASH). This constellation is also recognized as the metabolic syndrome and is characterized by insulin resistance. BHV is developing the SGLT2 inhibitor remogliflozin etzbonate ("Remogliflozin" or "Remo") for type 2 diabetes and NASH. Remo is presently in phase IIb clinical development.

14. In 2010, BHV executed a license with Kissei Pharmaceuticals ("Kissei") of Japan, the original discoverer and developer of Remo, for the exclusive worldwide rights to Remo excluding the territory of Japan.

15. In September 2013, Islet's investment banker, Cova Capital, through its principal and CEO, Edward Gibstein, approached Green and Wilkison about joining Islet's management team and to jointly develop BHV's Remo. From September 2013 through October 25, 2013, the parties had a number of discussions relating to the terms of employment of Green and Wilkison by Islet. On October 25, 2013, Islet's board approved the appointment of Green as CEO and Wilkison as COO of Islet. The parties thereafter began to negotiate the terms of a license of Remo from BHV to Islet. At that point, Green and Wilkison were on both sides of the transaction, essentially negotiating with themselves.

16. On January 25, 2014, Islet's board of directors held a conference call during which Cova Capital advised that the license structure could provide Islet and BHV with differing incentives and suggested an acquisition of BHV by Islet instead. The structure of an acquisition of BHV was discussed between the Islet's board, Cova Capital, Green and Wilkison, and the parties explored options for an upfront minority share grant plus additional milestone payments related to Remo's development. Islet specifically indicated its desire to maintain flexibility to pay the BHV owners, Green and Wilkison, in stock or cash.

4

17. On February 9, 2014, the parties agreed to the key terms of the merger, including the acquisition by Islet of 100% of the membership interests in BHV in exchange for Islet issuing 30 million shares of Islet common stock to Green and Wilkison and the potential for up to $71 million of additional purchase price payments based on the achievement of certain milestones.

18. Two days later, on February 11, 2014, plaintiff Schoninger met with Green, Wilkison and Edward Gibstein of Cova Capital in New York. Islet was in desperate need of cash and Green and Wilkison were eager for an investment in BHV's Remo by Schoninger and other investors introduced by Cova Capital. Consistent with their previous pitches to Cova Capital that had already been conveyed by Cova Capital to Schoninger, Green and Wilkison extolled the efficacy of Remo and their expectation that it would become a blockbuster drug. They stated that they had a 90% confidence level that Remo would be approved for the treatment of diabetes resulting in a $1 billion market value for the combined companies, and a 75% confidence level that it would be approved for NASH, resulting in a $5 billion market valuation. They stated that with approximately 102 million shares issued after the expected equity capital raised from Schoninger and other investors, and their estimate of a current $100 million value of the combined Islet and BHV, the share value was currently about $1.00.

19. At the February 11, 2014 meeting, Green and Wilkison stated that the terms of the merger had been negotiated with Islet and they were ready to announce the merger in two weeks. In addition to the upfront payment of 30,000,000 Islet shares, they were to receive additional milestone payments to them totaling $71 million that would be paid after Remo achieved the following milestones: $5 million after the end phase 2; $6 million at the start of phase 3; $20 million at the end of phase 3; and $40 million after the launch of the product. Significantly, Schoninger was told, as was Cova Capital, that the payments could be made in cash or by the

issuance of stock to Green and Wilkison at Islet's option. That option was critical to Schoninger and Cova Capital because if Islet's stock was undervalued at the time a milestone payment was due, potentially as a consequence of Islet's managers, Green and Wilkison, a cash payment would be preferable and would prevent an unwarranted dilution of value for the Islet shareholders. Conversely, if Islet's stock was properly valued or overvalued, due possibly to the actions of Islet's management (again, Green and Wilkison), they would receive their payment in shares.

20. Schoninger agreed to invest $1 million in Islet in exchange for Green's and Wilkison's agreement to sell BHV to Islet on the terms discussed. Schoninger would not have made the requested investment without Green's and Wilkison's agreement to sell BHV to Islet on the terms discussed. As part of that agreement, Schoninger received 4,000,000 common shares of Islet common stock at $.25 (of which he immediately transferred 1,600,000 to his children), raising his total shareholding to 5,600,000 and warrants to purchase 1,600,000 additional shares at $.25/share (of which he immediately transferred 400,000 to his children). As a consequence, Schoninger and his children would own or have the right to acquire over 7% of the combined companies as a result of the merger agreement with Green and Wilkison.

21. Schoninger informed his fellow investor, Allen, of the agreement he had reached with Green and Wilkison during the February 11, 2014 meeting, of which Allen could become a party if he invested. Allen agreed to purchase 70,000 shares of Islet common stock at $.25/share and warrants to purchase an additional 35,000 shares at $.25/share in return for Green's and Wilkison's agreement to merge Islet and BHV on the terms agreed with Schoninger.

6

22.     Cova Capital agreed to provide investment banking services and introduce investors, including the individual plaintiffs in this action, in return for defendants' agreement to merge Islet and BHV.

23.     On March 7, 2014, Islet's board approved entering into a letter of intent to merge with BHV. On information and belief, the terms of that letter of intent were materially different from the terms Green and Wilkison agreed with Schoninger and Cova Capital on February 11, 2014. Green and Wilkison did not discuss changing the terms of their agreement with Schoninger and Cova Capital.

24.     Significantly, Green and Wilkison waited until Schoninger, Allen and other investors signed their subscription agreements on March 10, 2014 and paid for their shares before publicly disclosing the letter of intent on March 12, 2014.

25.     The letter of intent and its accompanying press release on March 12, 2014 revealed Green's and Wilkison's breach of their agreement with Schoninger, Allen and Cova Capital to merge Islet and BHV on the agreed terms and revealed a broader and brazen fraudulent scheme. The terms of the letter of intent were dramatically different from the terms agreed at the February 11, 2014 meeting. First, the binding letter of intent provided that the milestone payments would be paid to Green and Wilkison five days after the milestone was reached by the issuance of shares only and the option to pay them in cash had been eliminated. Second, the letter of intent contained a perverse method for determining the number of shares to be paid to Green and Wilkison upon reaching each milestone. Rather than determining the number of shares based on the value of Islet shares at the time the milestone was reached, the number of shares to be issued with respect to each milestone would be determined using the "average closing price of the Islet common stock for the 30 days *preceding* the occurrence of

each milestone." (Emphasis added.) In other words, Green and Wilkison would receive shares valued *before* the milestone had been reached, disclosed to the market and incorporated into the market value of the stock. As a result, Green and Wilkison would receive far more shares than if the number of shares had been determined at the time the milestone had been reached, publicly disclosed and incorporated into the market value of Islet shares. By eliminating Islet's option to pay Green and Wilkison in cash, Islet would also have no way to thwart a scheme by Green and Wilkison to obtain an inflated number of undervalued shares which would inevitably rise in value following the announcement of reaching the milestone. With a cash option, Islet could pay Green and Wilkison through, among other ways, available cash, debt financing, selling territories, joint ventures, or equity financing through the sale of shares reflecting the higher share values following the relevant milestone. Green's and Wilkison's change to the milestone payment terms was not only a breach of their agreement with plaintiffs, it made their representations to plaintiffs false and it demonstrates that they were engaged in a purposefully fraudulent scheme.

26. The purported merger agreement dated as of September 30, 2014 again eliminated the option to make milestone payments in cash or shares and contained the same preposterous method of determining the number of shares to be paid to Green and Wilkison for reaching milestones:

> 6.11   Milestones
> 
> (a) In addition to the Thirty Million (30,000,000) shares of Holdco Common Stock (as adjusted for the Conversion Rate) to be received by the BHV members in the BHV Securities Exchange, Holdco shall issue to the BHV members, based on the percentages set forth on Schedule 2.3(b), within five (5) business days of the occurrence of the corresponding events set forth on Schedule 6.11(a) (each a "Milestone") the number of shares of newly-issued Holdco Common Stock equal to the (i) absolute value of the dollar amount set forth next to such Milestone on Schedule 6.11(a), equal

8

> in the aggregate to $71,000,000, divided by (ii) the volume weighted average price of Holdco Common Stock for the thirty (30) trading days preceding the occurrence of each Milestone as reported by Bloomberg L.P. (the "Milestone Shares"), subject to adjustment based on Section 6.11(h).

27. Plaintiffs attempted to cause Green and Wilkison to comply with their original agreement, and were repeatedly assured that the investors' concerns would be addressed. But Green and Wilkison never abandoned their fraudulent schemes and brazenly used the funds paid for the merger by Schoninger's group to execute the next phase of their fraudulent scheme.

28. Believing that Islet's shareholders would never approve their preposterous merger agreement, Green and Wilkison again negotiated with and for themselves at the expense and to the detriment of the plaintiffs by agreeing to terminate the merger agreement and causing Islet to enter into a license agreement dated March 3, 2015 for the rights to Remo. The license agreement was on terms even more favorable to defendants than the merger agreement they had tried to foist upon Islet and requires, among other things, (a) an upfront payment of $5 million (to themselves); (b) $112 million in additional milestone payments; (c) royalties on net sales; (d) excludes the territories of Latin America and Asia. In addition, unlike the merger pursuant to which Green and Wilkison would be major shareholders of Islet and committed to its success, Green and Wilkison would have little stake in the success or failure of Islet under the license agreement. The fact that Green and Wilkison, officers of Islet and owners/managers of BHV, were willing and able to impose such unfavorable terms upon Islet further demonstrates that they never had any intent to receive just shares in Islet and $71 million in compensation for the development of Remo as they had agreed with plaintiffs in exchange for their investments.

29. Upon information and belief, defendants misappropriated plaintiffs funds and spent a substantial amount of them exclusively on themselves and BHV to develop Remo for BHV alone.

## COUNT I

(Against Green and Wilkison for Breach of Contract)

30. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 29 as if fully set forth herein.

31. Plaintiffs and Green and Wilkison agreed on February 11, 2014 (and, in the case of Cova Capital, by February 9, 2014) on all material terms for the agreement to merge Islet and BHV.

32. Plaintiffs fully performed their obligations under the merger agreement by investing over $1 million in additional Islet common stock and warrants.

33. Green and Wilkison breached the merger agreement with plaintiffs by refusing to merge BHV with Islet pursuant to the terms agreed with Schoninger and Cova Capital.

34. Green's and Wilkison's breach of the merger agreement was material. They have completely abandoned the merger and pursued an incompatible license agreement between BHV and Islet.

35. As a consequence of the foregoing, Green and Wilkison are liable to plaintiffs for compensatory damages in an amount to be determined at trial, but in no event less than the value of plaintiffs' proportionate ownership in the combined BHV and Islet companies.

## COUNT II

(Against Green and Wilkison for Common Law Fraud)

36. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 35 as if fully set forth herein.

37. On February 11, 2014, Green and Wilkison misrepresented to Schoninger their intention to merge BHV and Islet on the terms they discussed.

38. Green's and Wilkison's misrepresentations to Schoninger induced him and Allan to invest over $1 million in Islet and induced Cova Capital to provide investment banking services and introduce investors, including the individual plaintiffs in this action.

39. Schoninger, Allen and Cova Capital justifiably relied on the representations of Green and Wilkison because they were both the owners of BHV and the managers of Islet.

40. Green and Wilkison intended to defraud Schoninger, Allen, Cova Capital and the other investors. The fact that the March 12, 2014 letter of intent, which dramatically differed from the terms represented to Schoninger, was agreed on March 7, 2014 but not disclosed until March 12, 2014, just two days after Schoninger and Allan invested on March 10, 2014, demonstrates that Green and Wilkison intended to defraud Schoninger, Allen and Cova Capital.

## COUNT III

(Against Green and Wilkison for Unjust Enrichment)

41. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 40 as if fully set forth herein.

42. Defendants misappropriated plaintiffs funds and spent a substantial portion of them exclusively on themselves and BHV to develop Remo for BHV alone.

43. As a consequence of the foregoing, defendants have been unjustly enriched at the expense of plaintiffs.

44. Defendants should be required to disgorge all monies, profits and gains from the BHV assets which they have obtained or will unjustly obtain in the future at the expense of plaintiffs, and a constructive trust should be imposed thereon for the benefit of plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, as follows:

i.   For compensatory damages in an amount to be determined at trial, but in no event less than plaintiffs' proportionate share in the value of the merged BHV and Islet;

ii.  For punitive damages in the amount of not less than $100,000,000.00;

iii. For a constructive trust upon defendants' ownership in BHV and any proceeds relative thereto for the benefit of plaintiffs as a consequence of defendants' unjust enrichment;

iv.  Plaintiffs' attorneys fees and costs, together with pre-judgment interest; and

v.   Such other and further relief that the Court deems just and proper.

Dated: New York, New York
March 24, 2015

SEYFARTH SHAW LLP

By: _____
Philip M. Smith

620 Eighth Avenue
New York, New York 10018
Telephone: (212) 218-5500
Facsimile: (212) 218-5526

*Attorneys for Plaintiffs*